STERNBERG *v.* CITY NATIONAL BANK OF FORT SMITH.

Opinion delivered July 4, 1921.

1. BANKRUPTCY ACT — POWERS OF TRUSTEE.—Prior to the amendment of § 47 a-2 of the Bankruptcy Act in 1910, a trustee in bankruptcy was vested with no better right or title to the property of the bank-

rupt than the latter had when the trustee's title accrued; but since that amendment the trustee is vested with the rights, remedies and powers of a creditor holding a lien by legal or equitable proceedings as against an unrecorded transfer.

2. SALES—CONDITIONAL SALES.—A vendor of a chattel may deliver possession on condition that the title shall not pass to the vendee until the purchase price shall be paid in full, and a subsequent purchaser without notice acquires no title as against the original vendor.

3. SALES—CONDITIONAL SALES—ORAL SALES.—Contracts for the conditional sale of personal property with reservation of title in the seller are not required to be in writing.

4. SALES—CONDITIONAL SALES.—Where a bank, at the request of a local dealer, advanced to a manufacturer of automobiles the price of cars shipped to be sold, and took separate notes reciting that the cars were deposited as collateral security, but the evidence showed that the cars were delivered to the local dealer with the understanding that title was retained in the bank until the money advanced on it was paid, the transaction constituted a conditional sale with reservation of title.

Appeal from Sebastian Chancery Court, Fort Smith District; *J. V. Bourland,* Chancellor; affirmed.

### STATEMENT OF FACTS.

On application of a creditor, the chancery court at Fort Smith, Arkansas, appointed a receiver to take charge of the property of the Adams-Cooper Sales Company as an insolvent corporation. The company was engaged in selling automobiles at retail in the city of Fort Smith at the time the receiver was appointed. The receiver took charge of certain automobiles owned by the company and sold them under direction of the court and held the money subject to the further orders of the court.

Subsequently the Adams-Cooper Sales Company was adjudged a bankrupt in the Federal court and M. Sternberg, trustee in bankruptcy, filed an intervention in the chancery court claiming the money derived from the sale of the automobiles by the receiver.

The City National Bank of Fort Smith, Ark., also filed an intervention claiming said money. The issue

raised by this appeal is as to which of said parties is entitled to the proceeds of the sale of the automobiles by the receiver.

I. H. Nakdimen, president of the City National Bank of Fort Smith, was a witness for the bank. According to his testimony, the Adams-Cooper Sales Company was engaged in selling automobiles by retail in the city of Fort Smith. The company bought its cars from the manufacturers. According to an agreement with the manufacturers, the sales company and the bank, whenever a car of automobiles was ordered, the bill of lading with the draft for the purchase money attached was sent to the bank. The sales company was notified when the car arrived. Before delivering the bill of lading to the sales company, the bank required the company to make a note for each car, giving the description of the car and everything. The bank did not let the sales company pay for the bill of lading, but the bank itself paid the cost of the automobiles to the manufacturer. The note given to the bank by the sales company specified the number of the car, the engine and so on, and when the car is sold the company brings the money to the bank and pays the note off.

One of the notes in question is as follows:

"Fort Smith, Ark., Oct. 2, 1918.
"No. 18941.

"Thirty days after date, without grace, we or either of us, promise to pay to the order of 'The City National Bank of Fort Smith, Fort Smith, Arkansas,' five hundred dollars, at the City National Bank of Fort Smith, with interest at ten per cent. per annum, payable annually, from maturity, until paid. Value received. Having deposited herewith, as collateral security for payment of this, or any other liabilities of ............... to said bank due, or to become due, or which may be hereafter contracted, the following property, viz:

"One Chevrolet touring car No. 43641, which I

hereby authorize the holder of this note to sell at public or private sale, without demanding payment of this note or debt due thereon and without further notice by advertising or otherwise, and apply proceeds, or as much thereof as may be necessary, to the payment of this note, and all expenses and charges, together with ten per cent. commission on all sales, holding myself responsible for any deficiency. Should there be any depreciation in value of said security prior to the maturity of this note, such an amount of additional security shall be furnished as will be satisfactory to said The City National Bank, and if the additional security is not furnished within two days after demand is made, either in person or by written notice put in postoffice, said bank may proceed at once to sell security as above specified.

"Demand, notice and protest waived.

"Adams-Cooper Sales Co. Inc.

"Troy Adams."

Every other note was like this except as to date, amount and description of the car. In other words, they were all written on the same form. The company had an agreement with the bank that when it ordered a car of automobiles the automobiles should be shipped with a draft and bill of lading attached for the purchase money to the bank.

The draft was drawn by the factory against the sales company and sent to the bank. The bank had an understanding that the title of the cars should be in it. Nakdimen said: "I want to explain the entire circumstance. Adams & Cooper has borrowed money from us. He had an understanding with us whenever he orders a carload of cars that we should loan him money when the carload of cars comes in. They generally come all alike, no exceptions, they come with a bill of lading attached to a draft for the amount of the cars.

"Q. Who was the draft on? A. The draft is drawn by the factory against the seller. Q. In this case? A. In this case Adams & Cooper. When the draft comes in,

it is sent to us, before we paid for it, we have an understanding that the title of these cars goes to us.

"Mr. Dailey:    I object to him saying before he pays for it.    Mr. McDonough:    That is a matter of cross-examination.    The Court:    Be a little more specific in your statement.

"A.    Well, when the bill of lading and draft comes, and when the car arrives, the understanding is that we loan him money to take that up, advance him money on it, and we take a lien on the cars until they are sold.    We pay the draft to the company, and we take notes for those cars, and when he sells the car the understanding is, when he sells the cars, he takes up one of the notes.

"Q.    How did you do that?    Mr. McDonough:    I object to the cross-examination pending the statement.    I think it is proper to let him get through.    Q.    Did you do that in each instance, Mr. Nakdimen?    A.    Yes, sir."

Again we quote from the testimony of Nakdimen the following:

"Q.    What did you do with the bill of lading when you marked the draft paid?    A.    Gave it to them.    Q. To whom?    A.    Adams-Cooper Sales Company.    Q.    Then after you gave them the bill of lading they went down to the railroad company and took the cars out?    A.    Yes, sir.    Q.    They unloaded them and took them to their place of business?    A.    Yes, sir.    Q.    And sold them there in the ordinary course of trade?    A.    I suppose so; I couldn't keep them in the vault in the bank.    Q.    But they took them out and sold them in the ordinary course of trade? A.    Yes, sir.    Q.    They were in the automobile business? A.    Yes, sir.    Q.    They were selling Chevrolet and Chalmers cars?    A.    Yes, sir."

Redirect examination by Mr. McDonough:

"Q.    In your testimony you referred to the title to the property being in the bank, and about a lien. I wish you would explain exactly the agreement between you and

the Adams-Cooper Sales Company in that matter? *Mr. Dailey*: I don't think he can explain an agreement. *The Court*: He can testify what he said and what they said was done. If you can't remember the exact language, give it as near as you can. Q. Just state what the facts are with reference to that agreement, the agreement relating to the method of handling cars? A. The agreement was just like the note says, and the only reason why the collateral in this case is not attached is because it is too bulky, and we have no room for it, and we give him the power to take it to his house and sell it, otherwise we would have had it attached to the note as collateral, because every car or cars we loaned money with the understanding we have got a lien on it until it is sold. The note shows for itself, and the only distinction is we can't take a car and keep it in the vault and put it in the note case.''

Again we copy from the testimony of the witness the following:

''Q. Now did they make any contract with you with regard to helping them handle their business? If so, what was that contract? A. Well, they made a contract with us, whenever they buy a carload of cars, they are willing to give us a lien on it provided we pay for it, and when the car comes the contract was to make a note for each car. There was generally three or four cars in a car, and they make a note for it; and when they sell a car they come and pay the money, and in the meantime when the carload arrives they will come in the bank and make the notes and take credit for it, and then make a check for the draft, in order to have a record for all the transactions for their benefit, and as well for the bank. That was a standing contract. Q. Were they buying from the manufacturer of the cars? A. Yes, sir. Q. Who did the ordering, you or them? A. They ordered from them to be sent through us. Q. Was there anything in your contract, and if so state what it was, which induced the manufacturer to send the bill of lading and draft to your bank? Was there anything in the contract about that, that you know of? If so, state what it was? If there was anything in

the contract what was it? A. That we have a lien upon the cars. Q. If there was anything in your contract to induce the bill of lading to be sent to your bank, rather than somebody else's bank. A. The inducement is the factory knows that we take care of it. Q. How do they know it? A. Every time that an automobile agent, every time they order the car, the agent used to some down; the agent of the factory comes down frequently and visits them and visits the bank they do business with, so the factory is aware of the bank. Q. Did you have arrangements with this company whereby you or they one would notify the factory to send the bill of lading to your bank? A. Yes, sir. Q. Now when it came to your bank what was the contract with reference to how you dicharged the thing, how would you pay it? A. By making notes for the car and we pay the factory. Q. Who would do that? A. Take the note and specifying the car, off the bill of lading and off the invoice. Every time, Judge, the factory sent a bill of lading there was an invoice and there was a draft. The bill of lading has to be delivered to the railroad company in order for them to deliver the car of automobiles to Adams-Cooper. The invoice was to them, so we copy it from the invoice the number of the car and the cost of it. That is the only way we could ascertain the number of the car and what it cost."

The chancellor found the issues in favor of the bank and a decree was entered accordingly. To reverse that decree the trustee in bankruptcy has duly prosecuted an appeal to this court.

*Dailey & Woods,* for appellant.

(1) The only question here is as to which has priority, the unrecorded lien of the bank or the lien given to the trustee by § 47a (2) of Bankruptcy Act as amended in 1910.

(2) The bankrupt was a dealer in automobiles. Bills of lading for the cars came through the bank for collection. The bankrupt would borrow from the bank on each car. The lower court found that the bank retained a lien not a title. The notes recited the pledge of the cars for payment. The notes are what are called "collateral

pledge notes.'' These notes were not recorded. To make valid such pledges, possession of the cars should have been delivered. 98 Ark. 384. An unrecorded chattel mortgage is not good as against strangers. 9 Ark. 112; 41 Ark. 186; 54 Ark. 179; 130 Ark. 287; 240 U. S. 642; 41 Am. B. R. 698.

(3) The title of the trustee is fixed as of date of the petition in bankruptcy. 129 Ark. 364; 34 Am. B. R. 80.

(4) The lien of the trustee in bankruptcy prevails over an unrecorded conditional sales contract. 34 Am. B. R. 75.

*Fadjo Cravens & Ira D. Oglesby* and *James B. Mc-Donough,* for appellees.

The transaction either amounted to a pledge or a verbal mortgage with possession in pledge, or the bank is entitled to an equitable lien for the unpaid purchase money advanced by it. The cars never left the possession of the appellee. The lower court so found. It was the understanding that the title of the cars went to appellee. The transfer of the bill of landing to appellee transferred the possession. 117 Ark. 180. Payment of the purchase money and transfer of bill of lading gave the bank title. Crawford & Moses' Dig. § 792; 64 Ark. 244. There was a sufficient symbolical delivery. See 98 Ark. 379.

The trustee's lien cannot take away from the bank its vested rights in the property. 43 Ark. 236; 58 Ark. 289; 23 Law. Ed. U. S. S. C. 64.

When the bank paid the draft, it became the absolute owner and possessor of the property. 90 Ark. 439; 117 Ark. 180; 92 Ark. 472.

The title never passed to the bankrupt. The bankrupt could not sell the bank's interest. 47 Ark. 363; 48 Ark. 160; 82 Am. St. 284.

The transaction was a conditional sale, in which the title did not pass. 101 Ark. 469. A similar question was decided in 137 Ark. 40. Giving of the notes was not inconsistent with retention of the title. 205 U. S. 340.

The claim of the appellee is an equitable lien, superior to the claim of the trustee. 153 Fed. 503; 234 U. S. 399.

If the pledge contract was void, the bank was entitled to the proceeds because of its advances to pay the purchase money. 267 Fed. 606; 263 Fed. 254; 262 Fed. 111; 260 Fed. 321; 256 Fed. 871; 105 Atl. 328; 174 N. Y. S. 375; 169 Pac. 964; 207 Fed. 535.

HART, J., (after stating the facts).   It may be stated at the outset that, prior to the amendment of the bankruptcy act in 1910, the trustee in bankruptcy was vested with no better right or title to the property of the bankrupt than the latter had when the trustee's title accrued. *York Mfg. Co.* v. *Cassell,* 201 U. S. 344.

Section 47a-2 of the bankruptcy act, as amended in 1910, gives to a trustee in bankruptcy "the rights, remedies and powers to a creditor holding a lien by legal or equitable proceedings thereon." See, also, *Fairbanks Shovel Company* v. *Wills,* 240 U. S. 642.   In that case the court said:

"Since the amendment of section 47a-2 of the bankruptcy act by the act of June 25, 1910 (ch. 412, § 8; 36 Stat. 838, 840), trustees have the rights and remedies of a lien creditor or a judgment creditor as against an unrecorded transfer."

If the transaction between the bank and the sales company constituted a conditional sale, it is manifest that under our decisions the bank is entitled to the proceeds arising from the sale of the automobiles by the receiver.

In *Starnes* v. *Boyd,* 101 Ark. 469, it was said that this court has uniformly adhered to the rule that the vendor of a chattel may deliver possession on condition that the title shall not pass to the vendee until the purchase price shall be paid in full, and that a subsequent purchaser without notice acquires no title as against the original vendor.   In that case under a contract for the sale of tim-

ber whereby it was agreed that the seller's brother "is to receive all the lumber and funds for the same" until the seller is paid in full for all his logs delivered at the price stipulated, it was held that the contract constituted a conditional sale with the reservation of title, and not an absolute sale with the reservation of a lien.

In *Bryant* v. *Swofford Bros.*, 214 U. S. 279, it was held that the validity of conditional sales depends upon the law of the State where made, and in bankruptcy proceedings the construction and validity of such a contract must be determined by the local law of the State. Following the decisions of the State of Arkansas, the court held that the sale of a stock of dry goods under a contract by which the articles sold were to remain the property of the seller until paid for, with provision for substitution of other goods and that the proceeds of the goods sold should also belong to the seller, constituted a conditional sale.

It is true that the contracts of sale in those cases were written ones, but this court has held that contracts for the conditional sale of personal property with the reservation of title in the seller are not required to be in writing. *Jones* v. *Bank of Commerce*, 131 Ark. 362, and *Estes* v. *Lamb & Co.*, 149 Ark. 369.

This brings us to a consideration of the question of whether under the facts as disclosed by the record, the transaction under investigation was a conditional sale or a contract for an equitable mortgage. It is often difficult to decide whether in a given case the contracting parties intended to make an absolute sale and to give the seller a lien on the property for the purchase money, or whether the transaction was intended as a conditional sale.

It is certain that when the property arrived at Fort Smith the title and possession were in the bank. A draft for the purchase money with a bill of lading attached was sent by the manufacturer and seller of the automo-

biles to the bank. In each instance the bank took the note of the sales company for the price of the automobile before it was turned over to the sales company. The bank itself transmitted the purchase money directly to the manufacturer of the automobiles. It is true that the note given by the sales company to the bank recites that the automobile is deposited as collateral security, and that Nakdimen in his testimony speaks of having a lien on the automobiles for the purchase money, yet, when the whole substance of the transaction is considered, we think it was a conditional sale. We attach no importance to the recitation in the note of the automobile being deposited as collateral security.

The record shows that the note was written on the printed form of the bank, and the form was the one generally used when notes were deposited with the note filled out as collateral security. It is plain that the automobile could not be deposited with the note as collateral security. There is much circumlocution in the testimony of Nakdimen due in part to the way he was examined and cross-examined. While he speaks in one place of having taken a lien on the automobiles for the purchase price thereof, in another portion of his testimony he speaks of retaining title in them until the purchase price was paid. This view of the transaction is borne out when we consider that a separate note was given for each automobile, and that it was considered a separate transaction. The bank became responsible to the manufacturer and seller of the automobiles at the time it permitted the sales company to take them from the possession of the railroad company. The acts and conduct of the parties indicate that it was the intention of the bank to retain the control of each automobile until it was sold and the proceeds applied to the payment of the purchase price. The fact that the sales company was allowed to have the possession of the automobiles and dispose of them does not under the authorities cited above prevent the transaction from being a conditional sale.

We think that when the testimony of Nakdimen, which is all the testimony there is on the question, is read and considered in connection with the note given by the sales company to the bank for the purchase money, the substance of the transaction is a conditional sale.

It follows that the decree of the chancellor was correct and must be affirmed.